

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/11/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIE L. JONES,

        Plaintiff,

    -against-

ANDREW M. SAUL, Commissioner of
Social Security,

        Defendant.

19-CV-5542 (LGS) (BCM)

**REPORT AND RECOMMENDATION TO
THE HONORABLE LORNA G.
SCHOFIELD**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Willie Jones brought this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act (the Act), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). Now before me for report and recommendation are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 16, 18.) I conclude that the Administrative Law Judge (ALJ) violated the treating physician rule by rejecting the opinion of plaintiff's treating physician without giving good reasons. Moreover, in weighing the opinion evidence, the ALJ made – and relied on – a number of non-trivial factual errors concerning the objective medical evidence before him. The same errors undermined the ALJ's evaluation of plaintiff's credibility and, ultimately, invalidated his determination of plaintiff's residual functional capacity (RFC). I therefore recommend, respectfully, that plaintiff's motion be granted, that the Commissioner's motion be denied, and that this case be remanded for further proceedings.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff filed applications for SSI and DIB on December 11, 2015 and January 15, 2016, respectively, alleging disability since November 1, 2013, due to left shoulder and lower back

problems, hypertension, gout, obesity, and acid reflux/gastroesophageal reflux disease (GERD). *See* Social Security Administration (SSA) Administrative Record (Dkt. Nos. 14, 14-1) (hereinafter "R. __") at 60, 61, 62-63, 71-72. The SSA denied those applications on March 14, 2016. (R. 10.) On March 22, 2016, plaintiff requested a hearing before an ALJ (R. 98), which took place on February 20, 2018, by videoconference. (R. 36-59.) ALJ Paul Armstrong presided from Chicago, while plaintiff appeared in New York, with counsel. (R. 37.) Vocational expert (VE) Pam Taylor appeared and testified via telephone. (R. 37, 52.)

In a written decision dated February 26, 2018 (Decision), ALJ Armstrong found that plaintiff was not disabled within the meaning of the Act. (R. 10-18.) On April 5, 2018, plaintiff requested Appeals Council review of the Decision. (R. 4, 162.) The Appeals Council denied plaintiff's request on February 8, 2019 (R. 1, 22), making the ALJ's determination final.

### B.    Personal Background

Plaintiff was born on December 13, 1963. (R. 16.) On the alleged onset date of November 1, 2013, he was 49 years old (R. 16), and thus, an individual "closely approaching advanced age." 20 C.F.R. §§ 404.1563, 416.963.

Plaintiff did not graduate from high school but has a GED. (R. 186.) From 1986 through 2013 he worked as a driver. (R. 187.) Until January 2005, plaintiff drove for the New York City Department of Homeless Services, transporting homeless families from shelters to apartments. (R. 42, 187.) From 2005 until January 2010, he drove for various trash companies. (R. 42, 187.) From January 2010 until November 2012, plaintiff transported supplies to restaurants. (R. 41, 187.) Finally, from November 2012 to November 2013, plaintiff worked for Access-A-Ride, driving a small bus used to transport people with handicaps. (R. 40, 187.)

Plaintiff traces his left shoulder and low back impairments to an accident on December 12, 2012, when his ceiling collapsed on him while he was showering in his bathroom at home. (*See*, *e.g.*, R. 261, 473.)  Plaintiff also complains of gout, hypertension, obesity, and acid reflux. (R. 62-63, 71-72.)

## II.   PLAINTIFF'S MEDICAL HISTORY

### A.   Pre-2014

The administrative record does not contain any treatment notes or other primary medical records concerning the December 12, 2012 accident or its aftermath. Plaintiff later told Phyllis L. Bieri, M.D. at Montefiore Hospital (Montefiore) that he was seen in the emergency room the morning after the accident, was "discharged home," and returned to work at Access-A-Ride. (R. 261.) Thereafter, however, he experienced "episodic lower back pain," which was only temporarily relieved by an epidural steroid injection in March 2013. (R. 261-62.) Additionally, plaintiff underwent "two repairs of his left shoulder in June and November of 2013." (R. 262.)[1]

### B.   2014

On May 21, 2014, plaintiff went to Central Bronx Hospital complaining of left shoulder pain. (R. 226.) He returned on May 28, 2014, reporting that his left shoulder pain had "gotten worse since surgery." (R. 215.) An MRI was performed, which revealed "no fractures or dislocations," but showed that there was a "widening of the acromioclavicular joint likely due to resorption of the distal clavicle; this finding may be inflammatory or post traumatic. There is likely

---

[1] The November 2013 surgery was performed at Central Bronx Hospital. (R. 215.) Although plaintiff has repeatedly stated that he had *two* labrum repair surgeries on his left shoulder, and so testified at the hearing before ALJ Armstrong (R. 43), the record is murky as to whether he had an earlier surgery in June 2013, which is what he told Dr. Bieri at Montefiore in July 2016 (R. 262), or a later surgery in 2014, which is apparently what he told consultative examiner Cheryl Archbald, M.D. in March 2016. (R. 232.)

an os acromiale." (R. 216.) Plaintiff was advised to follow up with his orthopedic surgeon. (R. 215.)

On October 16, 2014, plaintiff visited Daniel Pilosov, D.O., at the Morris Heights Health Center (Morris Heights), complaining of "severe back pain." (R. 419.) He saw Dr. Pilosov again on November 6, 2014, complaining of "severe pain in R wrist due to GOUT [sic]" (R. 414), and also on November 10, 2014, still complaining of right wrist pain. (R. 426.)

On October 29, 2014, plaintiff paid the first of many visits to David Shein, M.D. for an "independent evaluation of his back." (R. 476.) According to the New York Department of Health (DOH), Dr. Shein is a board-certified orthopedic surgeon. At the initial visit, plaintiff had "some vague radiation of back pain into his legs. Questioning him carefully it appears that his walking effort tolerance is no more than 1 block but this is because of low back pain and not leg pain." (*Id.*) Dr. Shein described plaintiff as "active and functional" and noted that he had experienced "significant relief in his symptoms" with an epidural injection in 2013. (*Id.*)

Plaintiff returned to Dr. Shein on November 19, 2014, bringing a "new MRI" with him. (R. 475.) According to Dr. Shein, the MRI report (which is not itself in the record) showed a "wide open, capacious canal," suggesting that there was no need for surgery, but also revealed signs of "compression of the disk and malalignment of the facet joints," which was "causing his pain." (*Id.*) In comparing the new MRI report to one dating from February 2013 (which is not otherwise in the record), Dr. Shein observed that "[t]here has been a definite change in the disk at L4-L5," causing "deterioration." (*Id.*) Dr. Shein prescribed a lumbar corset. (*Id.*)

On December 18, 2014, plaintiff told Dr. Shein that it was "difficult[] to sit for too long or stand for too long as he has excruciating pain in his back," and asked for pain medication. (R. 488.) On physical examination, plaintiff displayed diminished knee and ankle jerks and his "straight leg

raise [was] 90 degrees." (*Id.*) Dr. Shein provided him with a consultation for pain management and a prescription for oxycodone (a narcotic pain medication). (*Id.*)

### C.    2015

On January 29, 2015, Dr. Shein noted that plaintiff "continues to complain of pain in his lower back. He tells me he has difficulty sitting for too long and standing for too long due to back pain." (R. 487.) On examination, Dr. Shein found that plaintiff retained full motor strength (5/5), but diminished knee and ankle jerks, and a straight leg raise of 90 degrees. (*Id.*) On February 19, 2015, plaintiff told Dr. Shein that "he is seeing a pain specialist and the pain specialist offered him epidural injections but he is not keen on undergoing any type of epidural injection." (R. 486.) Dr. Shein advised plaintiff "not to undergo any injections until the MRI has been reviewed." (*Id.*) On March 12, 2015, plaintiff "continue[d] to complain of back pain," could not "stand for too long," and had to "shift his body weight as he feels pain into his back." (R. 485.) Dr. Shein looked at the new MRI report (which is not otherwise in the record) and noted that it showed "a well capacious spine," a flat back, and "a bulging disk at L3/L4 but this is not causing any central canal or foraminal stenosis." (*Id.*) Dr. Shein recommended "facet injections and a course of physical therapy for general strengthening." (*Id.*)

In a narrative report dated October 1, 2015, Dr. Shein wrote that the injuries sustained in the 2012 accident left plaintiff with "severe myofascial back pain. This is pain around the trapezial muscle mass. Even simply palpating the left and right trapezius, the periscapular muscles are more locally tender." (R. 473.) Dr. Shein added that plaintiff's MRIs showed "disk degeneration seen in the midlumbar region," including "disk narrowing at L4-L5." (*Id.*) According to Dr. Shein, plaintiff "worked as a driver but [now] cannot work because of this. He cannot drive for more than 10 or 15 minutes. If he drives on a bumpy road and applies axial force to his spine he becomes

incapacitated. He cannot sleep." (*Id*.)  Dr. Shein concluded: "[T]his man is incapacitated and 100%
disabled[.]" (*Id*.)

On December 18, 2015, plaintiff went to Morris Heights for a lumbar facet injection to his
back. (R. 450.) Three days later, on December 21, 2015, plaintiff returned to Morris Heights,
presenting with low back pain that radiated to his right gluteal region and posterior thigh to knee
level. (*Id.*) Dr. Pilosov observed that plaintiff appeared "in no acute distress" but walked with an
antalgic gait. (*Id.*) For the low back pain, Dr. Pilosov prescribed him cyclobenzaprine (a muscle
relaxant) and refilled his ibuprofen prescription. (R. 451.) For plaintiff's high blood pressure, Dr.
Pilosov refilled his prescription for amlodipine besylate (a calcium channel blocker). (*Id.*) And for
his foot pain, Dr. Pilosov referred him to a podiatrist. (*Id.*)

**D.      2016**

On April 1, 2016, plaintiff went to Montefiore for a CT guided facet block at L3-L4, L4-
L5, and L5-S1. (R. 255-58.) A few days later, on April 4, 2016, plaintiff visited Dr. Shein, reporting
that "the injections made him worse. He had severe discomfort[.]" (R. 471.) Plaintiff also
complained of dysesthesia (abnormal sensation) "involving the soles of his feet." (*Id.*) Dr. Shein
observed that plaintiff "cannot stand for more than 10 minutes. He cannot walk for more than 10
or 15 minutes and he spends most of his days sitting. This is beginning to affect his lifestyle and
his working capacity." (*Id.*) Dr. Shein reviewed yet another MRI report ("done in March 2016" but
not otherwise in the record), which showed "disk space narrowing with facet arthropathy at
multiple sites throughout his lumbar spine," and a "far right lateral neural foraminal bulging disk"
at  L2-L3 and L3-L4. (*Id.*) Dr. Shein referred plaintiff for EMG (electromyography) studies "to
look at the nerve function to his lower extremities," explaining that he was "looking for reasons

that may indicate surgical intervention on him because this man is clearly not improving," and "his life has become a major struggle." (*Id.*)

On July 26, 2016, plaintiff underwent an EMG/nerve conduction study at Montefiore. (R. 264.) Dr. Bieri and Eric Mittelman, M.D. found "bilateral lower lumbosacral radiculopathy." (*Id.*) "The right L5 nerve root was most affected, and showed moderate distal motor axon loss that was chronic." (*Id.*) Additionally, plaintiff's "[b]ilateral S1 nerve roots were also affected, but without significant motor axon loss." (*Id.*) Dr. Mittleman diagnosed "moderate severity right L5 radiculopathy with associated axon loss, and mild bilateral S1 radiculopathy with active denervation." (R. 270.)

On August 11, 2016, Dr. Shein reviewed the July 26, 2016 EMG study, which in his view showed "L5-S1 nerve root irritation involving both SI nerve roots." (R. 468.) Dr. Shein then compared the EMG study to the March 2016 MRI, "which does show an L2-L3 far lateral foraminal disk herniation and some problems of the L3-L4 disk but this does not correlate with what I see on the EMG studies." (*Id.*) The lack of "correlati[on]" between the EMG and the MRI concerned Dr. Shein, who also noted that a previous epidural injection had helped plaintiff for two months, and that his recent facet blocks "helped him significantly," indicating "that there is an element of epidural abnormality in his low back." (*Id.*)[2] Clinically, Dr. Shein observed that plaintiff "walk[ed] slowly with a broad-based type gait" and was "struggling. His walking is deteriorating. He is having severe back pain with radiation of pain particularly on the right-hand side, in the right buttock, posterior thigh, calf, and foot. . . .  It has affected his lifestyle, his activities of daily living, and he is unable to earn a decent living because of this." (*Id.*)

---

[2] This appears to be the only indication that the facet blocks administered in April 2016 helped plaintiff's pain symptoms.

Dr. Shein concluded that plaintiff "has problems related to both the epidural space and the nerve root elements as well as the axis of the spine as he has disk and facet arthropathy. The question is where. The MRI does not correlate with the EMG studies. I am beginning to feel that this man requires surgical intervention. He is not improving with conservative treatment." (R. 468.) "In order to make a definitive diagnosis of the problems here," Dr. Shein wrote, plaintiff would be sent for a CAT scan myelogram (an imaging technique using injected contrast dye). (*Id*.)

On September 14, 2016, plaintiff went to the emergency room at Montefiore with a gout flare in his right wrist. (R. 280-82.)

On September 23, 2016, plaintiff returned to Montefiore for the myelogram. Radiologist Allan Brook, M.D. found: "Multilevel mild lumbar degenerative changes, including disc bulges at L4-L5 and L5-S1, with no significant canal or foraminal stenosis. Multilevel thoracic Schmorl's nodes." (R. 306.) Dr. Brook also observed "[m]ild bilateral sacroiliac joint degenerative changes. Hiatal hernia." (*Id*.)[3]

On September 25, 2016, plaintiff again went to the emergency room with complaints of pain in his right wrist and swelling, which was diagnosed as another gout attack. (R. 337-40.) The following day, September 26, 2016, plaintiff visited Dr. Pilosov at Morris Heights for a "swollen and painful [right] hand and forearm." (R. 452.) Dr. Pilosov prescribed an Indomethacin capsule for plaintiff's gout. (*Id.*)

On October 18, 2016, plaintiff saw Dr. Shein, who wrote that he continued to complain of "ongoing pain into his lower back," radiating into his buttocks, thighs, and calves, "with associated tingling, numbness, and dysesthesia." (R. 483.) Reviewing plaintiff's recent myelogram, Dr. Shein

---

[3] Dr. Brook further noted that plaintiff was suffering from "low-pressure headaches" and was "post thoracic laminectomy for dural repair approximately one half years ago." (R. 306.) There is no other indication in the record of those symptoms or that surgical procedure.

noted "the presence of multilevel disk degeneration which are mild and are worse at L4/L5 and L5/S1; however, there is no significant canal or foraminal stenosis. He does have bilateral SI joint degenerative changes." (*Id.*) On December 22, 2016, plaintiff "continue[d] to complain of lower back pain" radiating to both lower extremities. (R. 481.) Dr. Shein again noted that plaintiff's "gait in the office is slow and tardy," and assessed "[m]yofascial pain syndrome." (*Id.*) [4]

**E.     2017**

Dr. Shein or one of his colleagues saw plaintiff six times in 2017. On March 8, plaintiff was "not really much better" despite epidural injections. (R. 467.) His "straight leg raise" remained "strongly positive particularly for pain felt in his low back." (*Id.*) Dr. Shein recommended "activity modification and to use his corset." (*Id.*)

On April 12, Dr. Shein observed that plaintiff "continues with persistent radiculopathy" and has a "mild antalgic limp," but had full motor strength in the lower extremities. (R. 466.) Dr. Shein recommended physical therapy. (*Id.*)

On May 11, plaintiff told physician assistant Martha Castro that he was having trouble arranging a referral for the physical therapy. His "straight leg raise is 90 degrees," his sciatic stretch test was negative, and his gait was "well maintained." (R. 480.)

On August 17, 2017, Dr. Shein observed that when plaintiff sits "he lists to the right-hand side," which "relieves the nerve roots." (R. 463.) Dr. Shein reported that the sciatic stretch test was "strongly positive" on the left, the straight leg raise was 90 degrees on both sides, and plaintiff had full strength in the lower extremities. (*Id.*) Dr. Shein assessed "lumbar disk prolapse disease L4-

---

[4] In addition to these encounters, plaintiff twice sought medical attention in 2016 for problems that he does not rely upon in his benefits application. On October 19, 2016, plaintiff went to Montefiore after punching a wall. X-rays of his left wrist and left hand revealed a "small chip fracture" and an "unlar styloid fracture." (R. 363, 369, 386.) On December 16, 2016, plaintiff went to the emergency room for "palpitation" (R. 395-96) but left before he could be treated. (R. 397.)

L5 and L5-S1." (*Id.*) He "had hoped that [plaintiff] would form osteophytes to stabilize the anterior and posterior longitudinal ligaments but clearly this is not happening." (*Id.*) Dr. Shein wrote that if plaintiff did not respond to physical therapy (scheduled to start the next month), "I am advising surgical intervention as this is an ongoing problem and it is simply not going to improve." (*Id.*) The surgery Dr. Shein had in mind was "an L4- L5, L5-S1 posterior lumbar interbody fusion." (*Id.*) Dr. Shein also noted that plaintiff was taking oxycodone twice a day, and that without the medication "the pain is about 10." (*Id.*)

On August 29, 2017, plaintiff attended his only recorded physical therapy appointment, with Denis Marais. (R. 460.) Marais observed that plaintiff "walk[ed] from [the] lobby to the examination table with signs of distress" and is "walking slowly" with "slight [sic] antalgic gait[.]" (*Id.*) Marais wrote that plaintiff is a "good candidate for skill therapy to decrease the symptoms" of his back condition and would "benefit from skill therapy 2 to 3 times a week for the next 8 weeks," with several short-term goals, including being "able to walk for 1 to 2 blocks and sit for 20 min." (*Id.*)

At plaintiff's last documented visit with Dr. Shein, on October 24, 2017, he was again "complaining of ongoing pain into his lower back" and reported that he had "difficulty with all activities." (R. 479.) Dr. Shein discussed with plaintiff "the need for surgical intervention," but wanted plaintiff to attend more physical therapy sessions before surgery. (*Id.*) Dr. Shein noted that plaintiff's "gait in the office is slow and tardy" and wrote that he should "avoid lifting, pushing and carrying heavy objects," and should "use the lumbar corset for when he is in pain." (R. 479.)

## III.    Opinion Evidence

The record contains medical opinion evidence from two physicians:  Dr. Shein, plaintiff's treating physician, and Dr. Archbald, who examined plaintiff at the request of the Division of

Disability Determination. According to the New York DOH, Dr. Archbald is a board-certified pediatrician.

### A.    Dr. Shein

On April 4, 2016, Dr. Shein completed a "Medical Source Statement of Ability to do Work-Related Activities" for plaintiff (R. 239-44), in which he opined, by placing check marks on a preprinted form, that plaintiff could occasionally (up to one-third of the time) lift up to 20 pounds, but could not carry anything. (R. 239.) Dr. Shein further opined that plaintiff could sit for up to 2 hours without interruption, and up to 3 hours in an 8-hour work day; could stand for up to 1 hour without interruption, and up to 1 hour in an 8-hour work day; and could walk for up to 1 hour without interruption, and up to 1 hour in an 8-hour work day. (R. 240.) Dr. Shein did not answer the question: "what activity is the individual performing for the rest of the 8 hours?" (R. 240.)

Dr. Shein wrote that plaintiff did not require a cane to ambulate (R. 240); that he could occasionally reach overhead, reach, handle, finger, feel, push, and pull with each hand (R. 241); and that he could occasionally operate foot controls with each foot. (R. 241.) However, according to Dr. Shein, plaintiff could never climb stairs and ramps, climb ladders or scaffolds, stoop, kneel, crouch, or crawl, though he could occasionally balance. (R. 242.) Plaintiff was able to perform activities like shopping, could travel without the need of a companion for assistance, could prepare a simple meal and feed himself, could care for his own personal hygiene, and could sort, handle, and use paper or files. (R. 244.) However, Dr. Shein opined that plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces or use public transportation. (*Id.*) Dr. Shein concluded, in handwriting: "no standing, lifting, pushing, carrying," and " unable to walk [] more than 1 block." (*Id.*)  Despite prompts on the form, Dr. Shein did not further explain the medical or clinical findings that supported his assessment.

On June 8, 2017, Dr. Shein wrote a brief letter "To Whom It May Concern," explaining that plaintiff "suffers from L4-L5, L5-S1 disk prolapse disease with spinal stenosis, facet arthropathy that causes kyphosis [an outward curvature of the upper spine], and perpetual low backache and functional incapacity. The neurological compromise due to disk prolapse disease is minimal at present but may become more severe as time progresses and no doubt will require surgical intervention if this occurs. For this reason [plaintiff] has become 100% disabled" and "cannot walk more than a half block." (R. 247.)

On December 27, 2017, Dr. Shein completed a physical medical assessment of plaintiff. (R. 249-52.) Using another check-the-box form, with no narrative, Dr. Shein opined that due to his ongoing lower back pain, plaintiff would miss 30 days of work per month, could sit for zero minutes, could stand for zero minutes, and could never lift any weight. (R. 249.) According to Dr. Shein, plaintiff required the use of an assistive device; could walk less than 100 feet without the use of the device; could never push or pull with either hand; and could not climb, balance, stoop, kneel, crouch, or crawl. (R. 250-51.) Dr. Shein wrote that plaintiff could shop, travel without a companion, prepare a simple meal, care for his personal hygiene, and sort, handle, and use papers/files, but could not walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with the use of a single handrail, or use standard public transportation. (R. 251-52.)

## B.    Dr. Archbald

Dr. Archbald conducted a consultative examination of plaintiff on March 8, 2016. (R. 232-36.) During the examination, plaintiff generally complained of pain in his left shoulder and back resulting from the ceiling accident. (R. 232.) He told Dr. Archbald that, following his two shoulder surgeries, he "continues to have pain in his left shoulder on a daily basis. He hears a cracking noise

when moving his left shoulder. His pain is worse with trying to raise his left arm." (R. 232.) Additionally, he reported that "[h]e has had lower back pain since the accident. It is a daily, constant pain." (*Id.*) Plaintiff "had facet shots that helped for two to three days," as well as epidurals, but "[p]ain medication puts him to sleep." (*Id.*)  Plaintiff reported that "his back pain is worse with increased sitting or increased standing and he has to switch positions frequently overnight." (*Id.*) Plaintiff told Dr. Archbald that he "had gout of his right toe since 1999 or 2000," which was "triggered by eating shrimp and clams" and alleviated by colchicine and naprosyn. (*Id.*) Asked about his daily activities, plaintiff told Dr. Archbald that "he used to do all the cooking at home, but he cannot anymore due to his pain." (R. 233.) Plaintiff could "make light meals," "do shopping," and "shower, bathe, and dress himself," but "does not do cleaning or laundry." (*Id.*) Plaintiff's activities, as reported to Dr. Archbald, included "watching TV, reading, going to doctor['s] appointments, going to the store, and socializing with friends." (*Id.*)

During the examination, plaintiff used no assistive devices, needed no help changing or getting on and off the exam table, and was able to rise from a chair without difficulty. (R. 234.) He "appeared to be in no acute distress" but walked "with a slight limp" and "defers walking on heels and toes due to concern of right toe pain." (R. 233.) Plaintiff could do a "quarter squat with complaint of right toe pain." (R. 234.) On examination, Dr. Archbald found that plaintiff's cervical spine showed a full range of motion but his lumbar flexion was limited to "20 degrees with concern of back pain" (*id.*),[5] and his supine straight leg raising test was positive at "20 degrees bilaterally with complaint of back pain." (*Id.*) Plaintiff's "[s]houlder forward elevation" on the right was "full"

---

[5] Normal lumbar flexion is 60 degrees. *See Cautillo v. Berryhill*, 2018 WL 1305717, at \*8 (S.D.N.Y. Mar. 12, 2018); *Johnson v. Comm'r of Soc. Sec.*, 2018 WL 3650162, at \*4 n.5 (S.D.N.Y. July 31, 2018*), aff'd sub nom. Johnson v. Comm'r of Soc. Sec. Admin.*, 776 F. App'x 744 (2d Cir. 2019), *cert. denied sub nom. Johnson v. Saul*, 140 S. Ct. 884 (2020), *reh'g denied*, 140 S. Ct. 1255 (2020).

but on the left was limited to 140 degrees with "pain and cracking noise in his left shoulder." (*Id.*)[6] Plaintiff's knee flexion and extension was full on the right, but limited to 120 degrees on the left, and "[h]e does this with his hips laterally rotated due to concern of back pain." (R. 235.)[7] Plaintiff also had "right toe tenderness and swelling due to gout." (*Id.*) His strength was full (5/5) in the upper and lower extremities. (*Id.*)

Dr. Archbald assessed high blood pressure, gout, back pain, and left shoulder pain. (R. 235.) She opined that plaintiff "has mild limitations with walking, moderate limitations with squatting, marked limitations with bending, and mild limitations with lifting." (*Id.*) She further explained: "He has mild limitations with kneeling on his right knee, moderate limitations with kneeling on his left knee, and mild limitations with climbing stairs." (*Id.*) Dr. Archbald did not opine on how long plaintiff could sit, stand, or walk in a job setting.

## IV.   HEARING

During the February 20, 2018 hearing, plaintiff testified that, after the 2012 accident in his home, he "had to have two surgeries on his [left] shoulder." (R. 43.) After the surgeries, he took over-the-counter pain medication like Ibuprofen, but his shoulder continued to "crack[] and pop[]." (*Id.*) He told the ALJ that he could lift his left arm above his head but doing so "hurts and it cracks." (*Id.*) Further, if he "lean[s] his head back, [his] whole arm will go numb." (*Id.*) Plaintiff testified that he was told that the issue was a pinched nerve as a result of surgery. (R. 48.)

---

[6] Normal shoulder elevation is 180 degrees. *See Palacios v. Berryhill*, 2018 WL 4565141, at *2 (S.D.N.Y. Sept. 24, 2018); *Nunez v. Berryhill*, 2017 WL 3495213, at *3 n.22 (S.D.N.Y. Aug. 11, 2017).

[7] Normal knee flexion is 135 to 150 degrees. *Nunez*, 2017 WL 3495213, at *3 n.21; *Bruce v. Colvin*, 2016 WL 7046757, at *4 (E.D.N.Y. Dec. 1, 2016).

Plaintiff also testified about his "history of gout" (R. 43), acknowledging that if he eats "the right stuff," then he generally is alright. (R. 44.) But if he eats too much meat or eats certain seafood, then the condition negatively affects him. (*Id.*)

The ALJ noted that plaintiff was "limping a little bit when [he] came in today." (R. 44.) Plaintiff explained that his back was hurting, which "makes [his] . . . leg numb." (*Id.*) He added that he hadn't "had any shots in a while," and that he did not want to "continually take these shots" because "you can get arthritis in your hips." (*Id.*) Due to his back pain, plaintiff stated, he could not play with his grandsons (R. 45), could not exercise anymore – except with "some little two pound weights" – and could walk "[m]aybe a block" before he had to stop. (R. 46, 48, 55.) Plaintiff testified that he could no longer help his wife by picking things up, for fear that his back would "explode" on him, and could no longer drive. (R. 46.) His wife drove him to the hearing, and they had to pull over in the middle of the drive so he could get out of the car. (*Id.*) He could not even "sit behind the wheel no more," after decades of driving for a living, and could not tolerate bumps in the road. (R. 47.) At home, plaintiff testified, his wife did the laundry (R. 56.) Although plaintiff could go to the supermarket, he could not linger or walk up and down the aisles. "I've got to know exactly what I'm trying to get." (R. 51.)

Asked about his medical treatment, plaintiff testified that he had been going to Dr. Shein for four years, and "it's just not getting better. It's getting worse and worse." (R. 49-50.) Plaintiff said that Dr. Shein referred him for various nerve tests and for facet blocks, which helped for a week before "it got tight again." (R. 50.) Plaintiff took pain medicine, and at one point experienced some relief with Epsom salt baths twice a week, but the Epsom salts gave him high blood pressure, so he stopped. (R. 50-51.) Plaintiff explained that he had lost 25 pounds, on Dr. Shein's advice,

but there was still "no change" to his back condition.  (R. 47.) Plaintiff told the ALJ that Dr. Shein

is "going to wind up doing the surgery." (*Id.*) Plaintiff was in favor of that approach. (R. 50.)

When asked if he had difficulty when sitting down, plaintiff testified that he did, and

announced that he needed to get up because "the longer I sit the more I get stiff." (R. 50-51.) On

the other hand, plaintiff testified, "[t]he longer I stand the more it gets stiff," so "what I'm doing

all day long is – trying to move." (R. 51.) Plaintiff added, "I don't stay in the house all the time."

(R. 55-56.) He went out to "get some fresh air," and would "go across the street to the store, come

back." (R. 56.)  Asked if he could take public transportation, plaintiff testified he could take a bus,

but "can't ride it far because the seats are too high." (R. 52.) He would not take the train, because

of "post-traumatic stress disorder after 9-1-1," presumably meaning September 11, 2001. (*Id.*)

ALJ Armstrong asked plaintiff whether he thought he could do "a lighter job [where] you

didn't have to drive and you only had to lift, like, 20 pounds or something, like." (R. 55.) Plaintiff

responded: "If I stayed inside, I would go nuts. That's why I always liked to drive. I can't – I can't

stay indoors." (*Id.*) ALJ Armstrong did not ask for clarification on this point.

After plaintiff's testimony, the ALJ examined the vocational expert. VE Tucker testified

that plaintiff's past work was classified as medium and semi-skilled. (R. 53.) ALJ Armstrong then

posed a single hypothetical: "an individual limited to light work" with "no overhead work with the

left non-dominant hand[.]" (R. 53-54.) VE Tucker responded that "the past work would be

eliminated" for that hypothetical claimant, but that such an individual "could perform work as an

inspector and hand packager," for which "[t]here would be approximately 28,000 positions

nationally," or as a "mail clerk," for which there would be "approximately 35,000 positions

nationally," or as a "small parts assembler," for which there would be "approximately 23,000

positions nationally." (R. 54.) All three positions are "light, unskilled, SVP 2." (*Id.*)

Plaintiff's counsel then asked VE Tucker a few questions, eliciting that, for the positions she listed, employees "typically cannot be off task more than 15 percent of the work day," or "miss more than one day per month on average." (R. 57-58.) However, all three of the positions she listed could be done in a "sit/stand position." (R. 57.)

## V.   ALJ DECISION

### A.   Standards

A claimant is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In his February 26, 2018 Decision, the ALJ correctly set out the five-step sequential evaluation process used pursuant to 20 C.F.R. §§ 404.1520(a) and 416.920(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. (R. 11-12.) The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her

past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given his residual functional capacity, age, education, and past relevant work experience. *See* 20 C.F.R. §§ 404.1560(c), 416.960(c). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Prior to steps four and five, the ALJ must determine the claimant's RFC, that is, the "most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, the objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

### B.    Application of Standards

At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since November 1, 2013." (R. 12.)

18

At step two, the ALJ found that plaintiff had the severe impairments of left shoulder degenerative joint disease, gout, obesity, and degenerative joint disease. (R. 12.)

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the regulations. (R. 12.) Plaintiff does not challenge the ALJ's findings at steps one, two, or three.

Before proceeding to step four, the ALJ determined plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) where the claimant lifts or carries 20 pounds occasionally and 10 pounds frequently, stands or walks for six of eight hours during the workday, and sits for six of eight hours during the workday. The claimant can have no overhead work with his left (non-dominant) arm.

(R. 14.)[8] In determining plaintiff's RFC, the ALJ considered plaintiff's testimony, his treatment history, the objective medical evidence, and the opinion evidence from treating physician Dr. Shein and consultative examiner Dr. Archbald. (R. 14-16.)[9]

In reviewing the medical evidence, the ALJ repeatedly noted that plaintiff displayed only a "slight limp" when walking (R. 14, 15, 16), "presumably from episodic gout in his right toe." (R. 14.) The ALJ also stressed that, during his examinations, plaintiff did not use an assistive device, needed no help changing or getting on or off the examination table, rose from a chair without difficulty, and was found to have "full strength," a "full range of motion in all joints," and "a negative straight leg raise test." (R. 14, 15, 16.) Additionally, the ALJ explained, although

---

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[9] In the Decision, ALJ Armstrong misspelled Dr. Archbald's name as "Archibald" and misspelled Dr. Shein's name as "Stein." (R. 15.)

plaintiff's July 2016 electromyogram showed radiculopathy, those results did not "correlate to findings on the MRI," which "showed mainly mild disk bulging." (R. 15.) The ALJ also found it significant that plaintiff had a "positive response to treatment." (R. 16.)

With respect to plaintiff's claims of pain and disfunction, the ALJ found that while his impairments "could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 15.) In support of this finding, the ALJ again noted that plaintiff "walked with only a slight limp, did not use an assistive device, needed no help changing, needed no help getting on or off the examination table, could arise from the chair without difficulty, had full range of motion in all joints, a negative straight leg raise test, full overall strength, and full grip strength." (*Id.*) In addition, plaintiff had "conservative spinal surgery [sic] that did not include surgery," and "appeared in good condition during the hearing." (*Id.*) "Lastly, the claimant is still able to perform activities of daily living," such as preparing light meals, shopping, and self-care, which together with other evidence showed that plaintiff's impairments "are not disabling." (*Id.*)

Turning to the opinion evidence, ALJ Armstrong accorded Dr. Shein's opinions "little weight" because they were "contradicted by testing that showed the claimant walked with only a slight limp, did not use an assistive device, needed no help changing, needed no help getting on or off the examination table, could arise from the chair without difficulty, had full range of motion in all joints, a negative straight leg raise test, full overall strength, and full grip strength." (R. 16.) The ALJ further found Dr. Shein's opinions contradicted by the "conservative spinal treatment in the record that did not include surgery." (*Id.*) The ALJ accorded Dr. Archbald's opinion "some weight," reasoning – in a single sentence – that although her conclusions were "generally supported

by [her] examination," her opinion was "otherwise vague concerning the claimant's functioning." (R. 15.)

At step four, on the basis of his RFC determination, the ALJ found plaintiff unable to perform any past relevant work. (R. 16.)

At step five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 16.) Based on the testimony of VE Tucker, plaintiff could be employed as an inspector/hand packager, mail clerk, or small parts assembler. (R. 17.) The ALJ therefore found that plaintiff was not disabled, as defined in the Act, from November 1, 2013, through February 26, 2018, the date of the Decision. (*Id*.)

## VI.   ANALYSIS

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Comm'r of Soc. Sec.*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The law governing cases such as this is clear. The reviewing court "may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation*

*adopted*, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

In this case, plaintiff argues that the ALJ violated the treating physician rule when he accorded little weight to Dr. Shein's opinion, and improperly weighed the "raw" medical evidence on his own after effectively rejecting all of the opinion evidence in the record. Pl. Mem. (Dkt. No. 16) at 7-12. Plaintiff also argues that the ALJ erred in performing a "perfunctory subjective symptom analysis," thereby improperly discrediting plaintiff's testimony. *Id.* at 12-15. The Commissioner disagrees, arguing that the ALJ properly evaluated the medical opinions of record, gave "good reasons" for the low weight he assigned to Dr. Shein's opinion, and properly evaluated plaintiff's subjective statements, and that substantial evidence supports the ALJ's RFC determination. Def. Mem. (Dkt. No. 18) at 12-21.

I agree that the ALJ violated the treating physician rule when he assigned "little" weight to Dr. Shein's opinions based on his own review of the medical evidence in the record. Moreover, the ALJ made significant factual errors in reviewing the medical evidence, and relied on the same erroneous understanding of the facts to evaluate plaintiff's credibility and, ultimately, to determine his RFC. Consequently, his decision denying benefits "is not supported by substantial evidence," *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996), and remand is required.

## A.    The Treating Physician Rule

Where, as here, a disability claim was filed before March 27, 2017, the ALJ was required, when weighing and analyzing medical opinion evidence, to give controlling weight to the opinion of plaintiff's treating physician, so long as those opinions were well-supported by medical findings and not inconsistent with other evidence in the record. 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2).[10] The rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

"Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given." *Norman v. Astrue*, 912 F. Supp. 2d 33, 73 (S.D.N.Y. 2012). Those factors include the "[l]ength of the treatment relationship and the frequency of examination"; the "[n]ature and extent of the treatment relationship"; the "[s]upportability" of the opinion, particularly by "medical signs and laboratory findings"; the "[c]onsistency" of the opinion with "the record as a whole"; the physician's level of "[s]pecialization" in the relevant medical field; and any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Under this standard, the ALJ may decline to afford the opinions of a treating physician controlling weight where those opinions "are not consistent with other substantial evidence in the record." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). "When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it

---

[10] Sections 404.1527 and 416.927 apply to disability claims filed before March 27, 2017, even if the hearing took place or the decision was issued after that date.

will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). *See also* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

However, if the ALJ does not afford controlling weight to the treating physician's opinions, he must provide "good reasons" for that decision. *Halloran*, 362 F.3d at 32-33 (citing *Schaal*, 134 F.3d at 505). *See also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our . . . decision for the weight we give your treating source's medical opinion."). Moreover, in weighing a treating physician's opinion, the ALJ "cannot arbitrarily substitute his own judgment for competent medical opinion." *Balsamo*, 142 F.3d at 81 (quoting *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)). The ALJ may "resolve issues of credibility as to lay testimony or [ ] choose between properly submitted medical opinions," but may not "set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Id.*

Two additional principles are relevant here. First, an ALJ may not "cherry-pick" medical opinions, or selectively cite treating notes or diagnostic imaging that support the ALJ's own view while ignoring opinions and evidence that do not. *Marrero Santana v. Comm'r of Soc. Sec.*, 2019 WL 2330265, at *9 (S.D.N.Y. Jan. 17, 2019), *report and recommendation adopted sub nom. Santana v. Comm'r of Soc. Sec.*, 2019 WL 2326214 (S.D.N.Y. May 30, 2019); *Annabi v. Berryhill,* 2018 WL 1609271, at *16-17 (S.D.N.Y. Mar. 30, 2018) (collecting cases). Second, remand is required if the ALJ has relied upon factual errors to weigh a treating physician's opinion, *Zabala v. Astrue,* 595 F.3d 402, 409 (2d Cir. 2010), unless "application of the correct legal standard could lead to only one conclusion." *Id.* (quoting *Schaal,* 134 F.3d at 504); *accord Marrero Santana*, 2019 WL 2330265, at *9.

24

Here, the ALJ gave little weight to any of the opinions of plaintiff's treating physician Dr. Shein. In finding plaintiff capable of light work – limited only by his inability to reach overhead with his left arm – the ALJ effectively rejected all of Dr. Shein's conclusions concerning plaintiff's exertional capacity, postural limitations, and ability to sit, stand, and walk for the periods required to engage in light work. Moreover, he appears to have done so based on a single regulatory factor – the extent to which Dr. Shein's opinions were supported by the relevant medical evidence in the record – without acknowledging other significant factors, such as the length of the treatment relationship, the frequency of examination, and Dr. Shein's expertise in orthopedics. Nor did the ALJ discuss the extent to which Dr. Shein's opinion was consistent (or inconsistent) with the opinion of consultative examiner Dr. Archbald, which the ALJ also, for the most part, ignored.[11]

An ALJ's failure to separately discuss each factor set forth in the relevant regulations does not necessarily require remand, *Halloran*, 362 F.3d at 32-33, so long as his "reasoning and adherence to the regulation are clear." *Atwater v. Astrue,* 512 F. App'x 67, 70 (2d Cir. 2013); *accord*, *Gabrielsen v. Colvin,* 2015 WL 4597548, at *8 (S.D.N.Y. July 30, 2015). In this case, however, in determining that Dr. Shein's opinions were "contradicted by testing" (R. 16), the ALJ improperly "substitute[ed] his own judgment" about what that testing showed "for competent medical opinion." *Balsamo*, 142 F.3d at 81. Moreover, ALJ Armstrong did not simply assign more weight to the consultative opinion than to the opinion of plaintiff's treating physician, *cf. Suarez v. Calvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) ("an ALJ may give greater weight to a

---

[11] Although the ALJ wrote that he gave Dr. Archbald's opinion "some" weight (R. 15), his determination that plaintiff was capable of light work appears inconsistent with her finding that plaintiff had mild limitations with walking and lifting. (R. 235.) Moreover, the ALJ did not incorporate any postural limitations into his RFC formulation (other than a prohibition on overhead reaching with the left arm), thereby ignoring Dr. Archbald's assessment that plaintiff had "moderate" limitations with squatting and kneeling (on his left knee), and "marked" limitations with bending. (R. 235.)

consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence") (internal quotations omitted); rather, he rejected both, choosing instead to draw his own conclusions from the underlying medical records. As a result, he formulated an RFC that ignored almost all of the functional restrictions identified by both opining physicians.

This was error. "Imaging reports and physical examination observations are raw data and bare medical findings, which the ALJ is not entitled to interpret, particularly in a manner conflicting with a medical opinion." *Golden v. Saul*, 2020 WL 3248821, at *5 (W.D.N.Y. June 16, 2020). Yet ALJ Armstrong interpreted plaintiff's September 2016 lumbar myelogram (which he described as showing "mainly mild disk bulging") and examination results (which he described as showing a "full range of motion in all joints" and a "negative straight leg raise test") as inconsistent with Dr. Shein's function-by-function assessment of plaintiff's physical abilities. (R. 15-16.) He should not have done so. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion."); *Gallishaw v. Comm'r of Soc. Sec.*, 296 F. Supp. 3d 484, 497 (E.D.N.Y. 2017) (by "characterizing" the treating physician's clinical findings as "nearly normal," and assuming that plaintiff's symptoms "permitted a much broader functional capacity, the ALJ improperly substituted her 'own expertise or view of the medical proof for the treating physician's opinion'") (citations omitted); *Dusharm v. Colvin*, 2016 WL 1271490, at *5 (N.D.N.Y. Mar. 31, 2016) (remanding where ALJ "improperly relied on her own view of the clinical findings," including a finding that an MRI showed "no canal stenosis and no foraminal stenosis," to "discredit" a treating physician's opinion).

Similarly, it was error to reject Dr. Shein's opinions because of "the conservative spinal treatment in the record that did not include surgery." (R. 16.) It is well-settled that the opinion of a treating physician may not be "discounted merely because he has recommended a conservative treatment regimen." *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *see also Shaw v. Chater*, 221 F.3d 126, 134-35 (2d Cir. 2000) (reversing decision denying benefits where the ALJ improperly "imposed [his] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered"); *Owens v. Berryhill*, 2018 WL 1865917, at *6 (E.D.N.Y. Apr. 18, 2018) (collecting cases). While an ALJ may take conservative treatment "into account along with other factors," *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 646 (S.D.N.Y. 2019), he may not rely on the absence of surgical intervention to discount a treating physician's opinions – and he certainly may not do so without mentioning that the same physician expressly proposed that the patient undergo "an L4- L5, l5-S1 posterior lumbar interbody fusion" (R. 463) because he was "not improving" and "not going to improve" under a more conservative regimen. (R. 463, 468.)

This is not the only instance in which the ALJ improperly cherry-picked the medical evidence in order to assign the opinion of Dr. Shein "little" weight. For example, the ALJ noted that "[i]n February 2016, the claimant reported improvement with physical therapy" (R. 15), but did not mention that the improved joint was plaintiff's right knee – as to which he never claimed a disabling impairment. (R. 229.) There is no evidence in the record that plaintiff's low back pain, left shoulder pain, or related mobility issues improved with physical therapy. Nor is there any evidence (apart from the treatment note regarding the right knee) that plaintiff generally had a "positive response to treatment" (R. 15, 16), with the exception of an epidural injection in March 2013 – prior to the alleged onset date – which gave him several months of relief. (R. 476.). Later

injections, as noted above, were less successful (R. 450, 471), leading Dr. Shein to prescribe a narcotic medication to control plaintiff's pain. (R. 463, 488.) The ALJ nowhere acknowledged plaintiff's need for oxycodone to reduce his pain from a "10" (R. 463) to a more manageable level.

The ALJ did not simply cherry-pick the medical evidence; in several instances he mischaracterized the evidence he did cite. For example, the ALJ explained that he discounted Dr. Shein's opinions because "testing . . . showed" that plaintiff "did not use an assistive device," "had full range of motion in all joints," and had "a negative straight leg raise test." (R. 16.). In fact, plaintiff was prescribed a corset (R. 475, 467, 479), displayed a significantly reduced range of motion in the lumbar spine and some limitation in the left shoulder (R. 234), and had repeated positive straight leg raise tests, noted both by Dr. Archbald (R. 234) and by Dr. Shein, who wrote on March 8, 2017, that plaintiff's "straight leg raise" remained "strongly positive." (R. 467.)

These are "non-trivial factual errors," which "collectively undermine" the ALJ's weighing of Dr. Shein's opinion. *Marrero Santana*, 2019 WL 2330265, at *12; *see also Conyers v. Comm'r of Soc. Sec.*, 2019 WL 1122952, at *21 (S.D.N.Y. Mar. 12, 2019) (remanding where "the ALJ's factual errors were not trivial, and affected numerous aspects of his analysis, including the weight he gave to the medical opinion evidence before him, his evaluation of plaintiff's credibility, and his formulation of plaintiff's RFC"); *Gomez v. Comm'r of Soc. Sec.*, 2017 WL 1194506, at *15-17 (S.D.N.Y. Mar. 30, 2017) (finding that the ALJ's numerous factual errors, some of which were significant to his ultimate conclusion, required remand).

On this record, the Court cannot conclude that the ALJ gave "good reasons" for rejecting the opinions of plaintiff's treating physician. *See Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician['s opinion[.]"). Here, as in *Pataro v. Berryhill*, 2019 WL 1244664, at *17 (S.D.N.Y.

Mar. 1, 2019), "[t]he ALJ simply ignored Dr. Shein's opinions as to plaintiff's ability to sit, stand, and walk. He did not incorporate any of these limitations in plaintiff's RFC, and did not give good reasons (or any reasons) for failing to do so." As in *Pataro*, remand is required.

### B.     Credibility

"An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court," *Rivera v. Berryhill*, 2018 WL 4328203, at *10 (S.D.N.Y. Sept. 11, 2018) (citing *Osorio v. Barnhart*, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006)), in large part "because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." *Marquez v. Colvin*, 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013). Thus, a district court will not "second-guess" the ALJ's credibility finding "where the ALJ identified specific record-based reasons for his ruling," *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010), and where the finding is supported by substantial evidence. *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

Where an ALJ rejects a claimant's testimony as not credible, however, the basis for the finding must be set forth "with sufficient specificity to permit intelligible plenary review of the record." *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)). Further, an ALJ's credibility determination – like an ALJ's evaluation of a treating physician opinion – cannot be based on unsupported interpretations of raw medical evidence or mischaracterizations of the record. *Henderson v. Berryhill*, 312 F. Supp. 3d 364, 369 (W.D.N.Y. 2018).

The regulations provide a two-step process for evaluating the credibility of a claimant's assertions of pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. 20

C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id.*

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (emphasis in original); *see also* 20 C.F.R. § 416.929.

In considering a claimant's pain and other symptoms, an ALJ must also consider a claimant's "daily activities"; the "location, duration, frequency, and intensity" of her pain; any precipitating or aggravating factors; the "type, dosage, effectiveness, and side effects of any medication" taken to alleviate the pain; "treatment" other than medication received by the claimant; any "measures" used by a claimant to relieve her pain or other symptoms; and any other factors concerning the claimant's "functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Lugo v. Barnhart*, 2008 WL 515927, at *22 (S.D.N.Y. Feb. 8, 2008) ("The ALJ is of course free to discount [the claimant's] testimony if he finds it not to be credible, but in assessing that credibility question he must consider a variety of factors specified in the SSA regulations, and consistent with the general requirement for a clear explanation of his analysis, he must sufficiently articulate his reasoning to demonstrate his compliance with the regulation."), *report and recommendation adopted*, 2008 WL 516796 (S.D.N.Y. Feb. 27, 2008).

Here, the ALJ found that plaintiff satisfied the first part of the test: his "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 15.) However, as to the second prong, the ALJ found plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record," citing most of the same factors on which he relied to discount Dr. Shein's opinion evidence – including plaintiff's supposed "full range of motion,"

"negative straight leg raise test," and conservative treatment. (R. 15.) In addition, the ALJ wrote that plaintiff "appeared in good condition during the hearing," and noted that he was able to perform many activities of daily living, including shopping, preparing light meals, "grooming, bathing, watching television, reading, and socializing with friends." (*Id*.)

Significantly, the ALJ did not discuss the key issues as to which he necessarily found plaintiff to be less than credible:  his claimed inability to sit and stand for more than short periods of time or to walk more than a short distance, due primarily to his back pain. The factors that the ALJ did discuss – including plaintiff's ability to change for a medical exam, rise from a chair, or walk a short distance to shop – are not inconsistent with his testimony on these issues (or with Dr. Shein's opinion as to his limitations). As noted above, "light work" requires an individual to lift up to 20 pounds at a time, "with frequent lifting or carrying of objects weighing up to 10 pounds" and "a good deal of walking or standing." 20 C.F.R. §§ 404.1567(b), 416.967(b); *see also* SSR 83-10. None of the daily activities in which plaintiff engaged required a similar degree of lifting, carrying, walking, or standing.[12] Moreover, the ALJ did not consider "the type, dosage, effectiveness, and

---

[12] The ALJ's statement concerning plaintiff's "good condition during the hearing" is equally puzzling, since the ALJ observed plaintiff limping at the hearing and gave him permission to stand up to testify when extended sitting caused him to stiffen up. (R. 44, 50.) Although an ALJ's observations of a plaintiff's demeanor while testifying are generally entitled to deference, the ALJ is not entitled to make *medical* judgments, or override those of the physicians who have submitted expert opinions, based on a claimant's appearance or conduct while testifying. *See Carroll,* 705 F.2d at 643 (ALJ's observation that the claimant "sat through the hearing without apparent pain" was the opinion of a lay person and was "entitled to but limited weight" on the issue of whether the claimant suffered pain); *De Leon v. Sec'y of HHS,* 734 F.2d 930, 935 (2d Cir.1984) (ALJ's observations concerning the claimant's appearance at the hearing "really do not contribute toward meeting the substantial evidence burden in cases of this nature"); *Aubeuf v. Schweiker,* 649 F.2d 107, 113 & n. 7 (2d Cir. 1981) (ALJ's reliance on personal observations to rebut treating physicians' observations and claimant's testimony "rais[ed] serious questions with respect to the propriety of subjecting claimants to a 'sit and squirm index,' and with respect to rendition by the ALJ of an expert medical opinion which is beyond his competence"). Thus, in *Cruz v. Bowen*, 1987 WL 19965, at *7 (S.D.N.Y. Nov. 12, 1987), the court reversed and remanded, for a calculation of benefits, where "[t]he second factor the ALJ used to support his determination" was his personal

side effects" of plaintiff's treatment in evaluating plaintiff's credibility. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). For example, the ALJ did not acknowledge plaintiff's limited success with epidurals or mention Dr. Shein's prescription for oxycodone.

The ALJ's credibility finding is further undermined by his reliance on objective medical facts which do not actually appear in the record. Because the ALJ mistakenly presumed that plaintiff did not use any assistive device, had a full range of motion in all joints, and negative straight leg raise tests (R. 15), the Court "cannot say" that his credibility determination "is supported by substantial evidence." *Horan v. Astrue*, 350 F. App'x 483, 485 (2d Cir. 2009); *see also Marrero Santana*, 2019 WL 2330265, at *13 (remanding where ALJ made adverse credibility finding based on a "mistaken belief" as to when plaintiff last played basketball); *Wilson v. Colvin*, 2016 WL 5661973, at *9 (W.D.N.Y. Oct. 3, 2016) ("although the ALJ provided 'specific' reasons for discounting Plaintiff's credibility, the Court cannot find that they were 'legitimate' reasons because they are based on a misconstruction of the record") (internal quotations omitted). Moreover, while "[o]ne or two factual inaccuracies may amount to harmless error," *Chandler v. Soc. Sec. Admin.*, 2013 WL 2482612, at *8 (D. Vt. June 10, 2013), numerous errors, particularly regarding matters upon which the ALJ relied, require remand. *Id.*; *see also Conyers*, 2019 WL 1122952, at *21 (remanding where "the ALJ's factual errors were not trivial, and affected numerous aspects of his analysis, including . . . his evaluation of plaintiff's credibility"). Here, as in *Conyers*, the ALJ's factual errors were not trivial. Thus, as in *Wilson*, the reasons that the ALJ

---

observation that plaintiff "did not appear to be significantly limited at the hearing, although she does use a cane to some degree."). In this case, the ALJ's personal observation was arguably entitled to even less deference, because the hearing was conducted over videoconference. *See Vanepps v. Comm'r of Soc. Sec.*, 2019 WL 1239857, at *10 (N.D. Iowa Mar. 18, 2019).

gave for discounting plaintiff's testimony were both inadequate and – to the extent based on those errors – illegitimate.

### C.     The RFC

Because the ALJ violated the treating physician rule and improperly discounted plaintiff's credibility, his RFC determination – that plaintiff was capable of light work, limited only by his inability to reach overhead with his right arm – was not supported by substantial evidence. *Marrero Santana*, 2019 WL 2330265, at *13; *see also Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) ("Once proper weight is given to the opinions of Brickhouse's treating physicians, the ALJ's decision is not supported by substantial evidence."); *Sanchez v. Colvin*, 2015 WL 4510031, at *17 (S.D.N.Y. June 1, 2015) ("The ALJ's failure to explain what weight was given Sanchez's treating physicians resulted in an improper RFC determination that is not supported by substantial evidence."). Moreover, in formulating plaintiff's RFC, the ALJ relied upon the same factual errors that fatally flawed his evaluation of the medical opinion evidence and plaintiff's credibility; as a result, his decision denying benefits "is not supported by substantial evidence." *Pratts*, 94 F.3d at 38; *Horan*, 350 F. App'x at 485; *see also Edel v. Astrue*, 2009 WL 890667, at *15 (N.D.N.Y. Mar. 30, 2009) (ALJ's finding is "not supported by substantial evidence where [the ALJ] relied primarily upon a misstatement of the record").

In finding plaintiff capable of light work, the ALJ rejected a whole range of exertional and postural limitations found by both Dr. Shein and Dr. Archbald, as well as plaintiff's testimony concerning his pain symptoms and his related tolerance for sitting, standing, and walking. However, there is no express discussion in the Decision of how long plaintiff could sit or stand at one time, nor how far he could walk. Nor did the ALJ discuss the implications of the VE's testimony that the jobs listed at the hearing could be performed in a "sit/stand position." (R. 57.)

Had the ALJ credited either physician's opinions as to these issues, or believed the plaintiff's testimony, he could not have formulated the RFC found in the Decision. The ALJ's errors were therefore not harmless, and "this action should be remanded to the Commissioner for a re-evaluation of the medical opinion evidence in the record, a reassessment of plaintiff's credibility, and reconsideration of his RFC in light of the entire record." *Marrero Santana*, 2019 WL 2330265, at *14; *see also Velez v. Berryhill*, 2018 WL 4609110, at *13 (S.D.N.Y. Sept. 25, 2018) ("On remand, the ALJ must . . . re-evaluate the opinions of Dr. Haberman and Dr. Phuntsok in light of this opinion . . . [and] re-assess plaintiff's impairments and residual functional capacity in light of his conclusions.").

## VII.    CONCLUSION

For the reasons stated above, I respectfully recommend that plaintiff's motion be GRANTED, that the Commissioner's motion be DENIED, and that this action be REMANDED for further proceedings. On remand, the ALJ should reconsider the weight assigned to the medical opinion evidence in light of the entire record; obtain new opinion evidence if the assessments now in the record remain unsatisfactory after proper evaluation; reassess plaintiff's subjective complaints of pain and related symptoms; and reformulate plaintiff's RFC accordingly.

Dated: New York, New York
     September 11, 2020

**BARBARA MOSES**
**United States Magistrate Judge**

34

## <u>NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS</u>
## <u>TO THIS REPORT AND RECOMMENDATION</u>

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Lorna G. Schofield at 40 Foley Square, New York, New York 10007. Any request for an extension of time to file objections must be directed to Lorna G. Schofield. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x, 486, 487 (2d Cir. 2018); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).